UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY J. ROSACRANS,

                  Plaintiff,                                    Case No. 05-72674

vs.

                                                HONORABLE AVERN COHN
                                                HONORABLE STEVEN D. PEPE

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

                  Defendant.
_____/

## REPORT AND RECOMMENDATION

I.      BACKGROUND

Mary Rosacrans brought this action under 42 U.S.C. § 405(g) to challenge a final

decision of the Commissioner denying her application for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act.  Both parties have filed motions for summary judgment,

which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the following

reasons, IT IS RECOMMENDED that this matter be REVERSED AND REMANDED FOR

RECONSIDERATION.

A. PROCEDURAL HISTORY

Plaintiff applied for DIB on November 20, 2000, due to shoulder, back and neck

problems.  (R. 52).  Her onset date of disability was September 27, 2000.  (R. 46).[1]  After

Plaintiff's application was initially denied, she had a September 12, 2002, hearing before

administrative law judge ("ALJ") B. Lloyd Blair who issued a decision on March 27, 2003,

---

[1] Plaintiff had previously filed for disability benefits and had a hearing in front of Administrative Law
Judge Lovert F. Bassett on January 27, 2000.  (R. 256 - 271).

finding Plaintiff not to be entitled to a period of disability. (R. 26-34).  On June 2, 2005, the
Appeals Council denied Plaintiff's request for review.  (R. 6-8).  Plaintiff's last date of insured
status for DIB was December 31, 2004  (R. 48).

### B. BACKGROUND FACTS

#### 1. PLAINTIFF'S HEARING TESTIMONY

At her September 12, 2002, hearing in front of ALJ Blair, Plaintiff testified that she was
48 years old, single, completed the 12th grade but had no further education or training (R. 276-
277), worked as an automotive assembly worker at General Motors for 21 years, and also as a
sewing machine operator, bus driver and an outside supervisor for the school system.  (R. 277-
278, and R. 53).  Plaintiff became disabled on September 27, 2000, and has not worked since
then due to problems with her shoulders and back pain.  (R. 278-279).

Plaintiff had three shoulder surgeries, two on the right and one on the left, and continues
to have pain in her shoulders and back.  (R. 279-280).  Plaintiff assessed the pain in her right
shoulder before surgery as an 8 out of 10, and stated that it has flared up again in the last year.
(R. 280). Upon consulting her physician, Plaintiff was told by Dr. Janda, "there's really not too
much more he can do.  It's the best it's going to be." (R.281).  Plaintiff described her right
shoulder pain and limitations: "I have a hard time holding my arms up if I was to do my
hair…and just reaching is just, can be excruciating pain for me."  Plaintiff also stated that when
she did certain things and rotated her shoulder back she experienced a "big old crack which
creates a lot of pain."  According to the Plaintiff's Pain Questionnaire, Plaintiff was in constant
pain and "if I do anything it bothers me" and weather is especially aggravating (R. 65-66).

Plaintiff also had pain in her left shoulder, which was caused by overusing her left extremity to compensate for the pain in her right.  Although since surgery, her pain is now at about a five out of 10, she is limited in her left upper extremity, similar to her right upper extremity, and is unable to use her left hand to do her hair.  (R. 282).  Plaintiff's doctor informed her she could continue to have surgery, but she stated, "I'm just quite tired of having surgery done…it all pertains to the scar tissue, it ends up building up in the shoulder."

Plaintiff has had constant pain in her lower back, beginning in 1978, due to no cushioning in her L4 and L5 area and "nerve damage that runs down from my right buttocks area down to my toe."   Plaintiff also had a "hot spot" on her right leg, above the ankle.  (R. 282-283).  Plaintiff prefers to take Vicodin only when "I'm in excruciating pain…because it's habit forming."  (R. 281).  Instead she stated she takes Aleve and Celebrex.  To relieve pain, Plaintiff typically sits in her recliner using a heating pad on her back and ice packs on her shoulders.  (R. 286).  As of the date of the hearing, Plaintiff had also received three injections for pain. (R. 283).

Plaintiff also suffered from depression and was hospitalized in February 2002 at the Tecumseh Stress Center (R. 288).  At the time of the September 2002 hearing, she was seeing a psychiatrist once a month and taking Prozac and Wellbutrin.  Plaintiff testified that she had, "always been a depressed person," but that it had worsened after she was forced to retire and she lost her brother in 2000.  (R. 289).  Plaintiff stated she does have suicidal thoughts, stating, "I thought that…I'd rather be dead than, you know, living the way I'm living…but, I mean, I never act on it, never act on it."

Plaintiff could squat, but had trouble getting up, could not bend, and could only climb a limited amount of stairs.  (R. 283).  Plaintiff can sit 15 minutes before needing to stand up, and walk about five blocks, but would be in extreme pain if she went any further.  (R. 283-284).

3

Plaintiff could lift about 8 pounds, but would be in pain and could not lift anything repetitively. (R. 286).  She had trouble sleeping through the night due to her lower back pain (R. 284) and took Trazodone to help her sleep.  (R. 287).  Plaintiff shops, cooks and does housework, but "that takes me days to do."  (R. 285).  She has had to give up some activities (like golfing and bowling), yet she attends meeting three days a week for her 12-step group.

As of August 28, 2002, Plaintiff was taking Vicodin as needed for pain and the following medications daily: Prevacid, Zyrtec-D, Vioxx, Celebrex, Lipitor, Prozac, Wellbutrin, Trazondone, Advair and Advil.  (R. 204).

### 2. MEDICAL EVIDENCE

The record contains partially legible hand-written exam notes from visits with Dr. Marie Cordoba- Naguit, M.D., ranging from March 12, 1999, to October 12, 2000.  (R. 116-139).  On March 12, 1999, Plaintiff saw Dr. Cordoba- Naguit and complained of chest pain, pain in her left shoulder, anxiety and feelings of depression.  (R. 121).

A March 16, 1999, exercise test revealed that Plaintiff had no evidence of coronary artery disease.  (R. 135).

On June 8, 1999, Allan G. Clague, M.D., performed neurological consultation on Plaintiff, upon referral from Plaintiff's workers' compensation lawyer, to address her persistent muscular and musculoskeletal pain, including pain in her right upper shoulder, back, chest and neck region.[2]  (R. 206-211).  Exam notes described Plaintiff's medical and pain history as it

---

[2] At Plaintiff's first hearing on January 27, 2000, her representative indicated she was on totally disability retirement from General Motors. (R. 2610. Her December 6, 2000 applications for DIB indicated she never filed for workers' compensation benefits. (R. 46). Dr. Clague's report indicated Plaintiff contacted the attorney "after she had been denied workers' compensation." (R. 207). Dr. Clague's report supported such a claim. (R. 211).

4

related to her position with General Motors. According to the exam notes, after Plaintiff's right shoulder surgery on August 1, 1998, she had 66 visits with Carter Rehab Center, after which she informed Dr. David Janda, her orthopedic surgeon, that physical therapy was "killing her" and made her pain worse. (R. 208). After numerous steroid injections did not ease her pain in the right shoulder, Dr. Janda told her there was nothing more he could do. Plaintiff also informed Dr. Clague that walking on hard surfaces increased her pain, that she had a "great deal of difficulty doing her hair and shaving the underarm region" and she could not do repetitive movements, such as peeling potatoes.

Dr. Claugue found Plaintiff suffered from: 1) overuse syndrome of both upper extremities; repetitive strain injury; right greater than left with resultant: a) fibromyalgia of the shoulders, right greater than left; trapezius muscles, right greater than left; scapular, periscapular and upper back muscles, right greater than left; and pectoral muscles, right greater than left, b) degenerative joint disease of the right acromioclavicular joint with an associated impingement syndrome of the right shoulder with underlying bicipital tendonitis; 2) bilateral neurosensory hearing loss; and 3) chronic musculoskeletal low back pain by history. (R. 210). Based on his diagnosis, Dr. Clague opined that Plaintiff had a "total permanent lifelong disability" and was "totally disabled medically from carrying out any form of gainful employment."

On October 21, 1999, Plaintiff visited Dr. Cordoba- Naguit for head congestion, coughing and night sweats. (R. 121).

A March 16, 2000, sinus x-ray indicated a normal sinus examination (R. 156). A March 21, 2000, esophagram and upper gastrointestinal series indicated Plaintiff suffered from heartburn and difficulty swallowing. (R. 155). On March 28, 2000, Plaintiff saw Randall J.

Guttridge, D.O. for allergy testing due to her chronic nasal stuffiness and hoarseness in her voice. (R. 153-154). A March 30, 2000, x-ray revealed Plaintiff had a normal chest. (R. 152).

On April 24, 2000, July 6, 2000, and July 11, 2000, Plaintiff visited Dr. Cordoba- Naguit due to coughing that kept her from sleeping at night. (R. 119-120).

On May 14, 2000, Plaintiff went to Herrick Memorial emergency room complaining of chest pain and shortness of breath. (R. 94). Plaintiff's ECG results and exam were normal and she was released a diagnosis of acute left chest wall pain. (R. 99 - 101, 96, 103).

On July 28, 2000, Plaintiff visited Herrick Memorial emergency room complaining of severe chest pain and coughing up a yellow-brown substance. (R. 109). Plaintiff was diagnosed with pleuritic chest pain and bronchitis, prescribed Vioxx and Vicodin, and was instructed to quit smoking and return if symptoms worsened. (R. 108).

On August 4, 2000, Plaintiff saw Dr. Cordoba - Naguit due to concern about her cough, chest pain and increased stress. (R. 119). As of this date, Plaintiff had prescriptions for Nasonex spray, Prozac, Claritin, Prevacid, Biaxin, Vioxx, Serevent, Flovent and Serazone. (R. 122).

On September 11, 2000, Plaintiff saw Dr. Cordoba - Naguit, complaining of inability to sleep and increased stress due to her brother dying. (R. 118). Treatment notes are not legible.

Plaintiff visited Dr. Cordoba- Naguit on October 12, 2000, complaining of pain in her left shoulder. (R. 116). Plaintiff received a prescription for Vioxx and was referred to Dr. Janda, who had treated Plaintiff's right shoulder.

On November 15, 2000, Plaintiff saw Dr. Janda for pain in both her shoulders, with more pain in the left, bilateral night pain, and increased pain with activities. (R. 142). Upon exam, Dr. Janda found Plaintiff suffered from clicking in the subacromial space and limited range of

motion in both shoulders. X-rays were consistent with a type I acromion and distal clavicle excision on the right shoulder and a type II acromion on the left shoulder.

On December 27, 2000, Plaintiff visited Dr. Janda for pain in both her shoulders.  (R. 140).  Exam notes indicated Dr. Janda had performed open acromioplasty and distal clavicle excision on Plaintiff's right shoulder in September 1998.  Dr. Janda determined Plaintiff suffered from a right shoulder contusion and left shoulder impingement with the possibility of a partial thickness cuff tear, which was healing.  Plaintiff received samples and a prescription for Vioxx and instructions to ice the shoulders as needed.

On March 17, 2001, Susan Davenport Geer, M.D., submitted a letter to the state's Disability Determination Services describing Plaintiff's treatment and diagnosis.  (R. 167).  Dr. Geer had treated Plaintiff since July 28, 2000, for major depression including sleep disorder, lack of motivation, lowered libido, increased appetite with waking feelings of irritability, being easily overwhelmed and helpless, agitation, cognitive impairment and panic.  Plaintiff's significant stress inducers were her chronic shoulder pain, inability to be physically active and perform basic household tasks, finances and her brother's cancer diagnosis.  According to Dr. Geer, Plaintiff continued to take anti-depressants at that time and found her prognosis to be "very good if she can get resolution of her health conditions including shoulder pain, energy, and depression, smoking as well as determination of her SSI (sic) status."  (R. 168).  Dr. Geer noted that inactivity is extremely difficult for Plaintiff and she "would function best with some kind of meaningful activity" and "will need to be restricted from overexerting herself physically and emotionally."

On April 3, 2001, Elizabeth S. Bishop, Ph.D., examined Plaintiff's psychiatric/psychological status for the Michigan Disability Determination Service.  (R. 169-

7

172).  Plaintiff had good reality contact, logical thought, sufficient memory and information although she was moderately depressed and had low self-esteem.  (R. 170-71).  Plaintiff commented that "I'm not comfortable around people," that she felt hopeless, but denied suicidal thoughts, "some days I forget to eat", and that her roommate handles household chores and finances because Plaintiff was "missing bills and getting messed up."  (R. 170).  Dr. Bishop observed that Plaintiff could not sit or stand for long during the evaluation and that she claimed a pain level of 7-8.  Dr. Bishop noted that Plaintiff could not meet her basic needs.  Dr. Bishop's diagnosis was  that Plaintiff should continue with mental health and medical treatment, might benefit from a pain clinic and she could barely manage funds.  (R. 172).

On April 19, 2001, Jacob Weintraub, M.D., after reviewing her medical records, completed his assessment of Plaintiff's Residual Functional Capacity.  (R. 159-166).  Plaintiff was limited to: lifting or carrying less 10 pounds frequently and occasionally; standing and/or walking about 6 hours in an 8-hour workday; sitting about 6 hours in an 8-hour workday; limited pushing and pulling in the upper extremities; could only occasionally climb, balance, stoop, crouch and crawl; could frequently kneel; and no overhead reaching (R. 160-162).

On April 30, 2001, Plaintiff saw Dr. Cordoba- Naguit for her chronic pain in her shoulder and back.  (R. 229).  Exam notes were barely legible.

On May 6, 2001, a state DDS physician completed Plaintiff's Mental Residual Capacity Assessment and found Plaintiff was moderately limited in her ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, and respond appropriately to changes in the work setting. (R. 173-174).  The Psychiatric Review Technique Form indicated Plaintiff to be mild to moderately limited in her activities of daily living, maintaining social functioning and only mildly limited in

8

maintaining concentration, persistence or pace.  (R. 187).

On June 14, 2001, Plaintiff saw Dr. Janda for anterior shoulder pain, night pain and increased pain with activities. (R. 246). Plaintiff stated that home exercises had not helped and Vioxx only helped minimally. Plaintiff was diagnosed with left shoulder impingement with probability of a "partial thickness cuff tear", which had not healed, and a right shoulder contusion. Plaintiff wished to proceed with surgery on her left shoulder.  (R. 247).

On June 28, 2001, Plaintiff again saw Dr. Janda for left shoulder complaints and indicated that she wished to proceed with surgery on her left shoulder in the near future.  (R. 245).

On July 3, 2001, Dr. Janda performed surgery on Plaintiff's left shoulder by completing a glenohumeral arthroscopy with arthroscopic acromioplasty and a left shoulder partial thickness rotator cuff tear debridement via a separate anterior capsular incision.  (R. 212).

On July 12, 2001, Plaintiff visited Dr. Janda for a post-surgery follow-up on her left shoulder and stated she was "doing quite well."  (R. 244).  Exam indicated Plaintiff had continued right shoulder impingement and limited range of motion in her right shoulder. Plaintiff was instructed on a home exercise program, icing and to take Vioxx as needed.

On August 16, 2001, Plaintiff saw Dr. Janda and stated her left side was "doing very well," but had ongoing difficulties with her right, which showed positive impingement sign, clicking in the subacromial space and limited range of motion. (R. 243).  Because Plaintiff was "pleased on her left shoulder" she wished to proceed with surgery on her right shoulder.

On October 4, 2001, Plaintiff saw Dr. Janda complaining of difficulties with her right shoulder and decided to schedule right shoulder arthroscopy, acromioplasty, and scar tissue excision.  (R. 242).  On October 10, 2001, Dr. Janda performed a revision arthroscopy on

9

Plaintiff's right shoulder and acromioplasty with scar tissue excision. (R. 215). On October 18,

2001, Plaintiff saw Dr. Janda for a follow-up. (R. 241). Exam notes indicated Plaintiff was

intact neurovascularly, but that her left shoulder was unchanged from the August 16, 2001,

exam. Plaintiff was started on a Thera-Band program and instructed to ice and continue with

anti-inflammatories as needed.

On November 15, 2001, Dr. Janda's exam notes indicated that Plaintiff reported she was

doing "great" about her bilateral shoulders. (R. 240). Dr. Janda suggested she could perform

activities as tolerated, continue icing and her yellow Thera-Band program.

On February 18, 2002, Plaintiff was admitted by Lenawee Health Alliance due to

depression and anxiety from her recent break-up of a long-term relationship, and expressing

suicidal thoughts. (R. 218). Plaintiff went to the hospital at the urging of Dr. Cordoba-Naguit.

(R. 220). Plaintiff had been depressed for the last 3 months and had "made a pack with my

therapists that I would seek help if I felt I was going to do something." Exam notes indicate

Plaintiff felt she could not go on, she was afraid to lose control and she didn't feel safe. (R.

219). Plaintiff was discharged on February 22 by Dr. Cordoba-Naguit, with a diagnosis of major

depression, leukocytosis with a negative chest x-ray and gastroesophageal reflux disease. (R.

223).

A June 26, 2002, Medical Assessment of Plaintiff's physical capabilities by Dr. Cordoba-

Naguit indicated that Plaintiff was limited to: lifting and carrying nothing frequently and 5

pounds occasionally; standing or walking a total of one hour in an 8-hour workday with only 10

to 15 minutes uninterrupted; sitting a total of 4 hours in an 8-hour workday with only 10 minutes

uninterrupted; no climbing, kneeling, crouching, stooping or crawling and occasional balancing.

(R. 227). Plaintiff was also limited by severe pain in her reaching, handling, feeling, pushing

and pulling abilities and her environmental restrictions included heights, dust, fumes, vibration, moving machinery, temperature extremes and humidity.

On July 10, 2002, Adam Leczycki, M.D., who is named as the attending physician on her hospital admissions (R. 222) completed Listing 12.04 Affective Disorders Questionnaire, and found Plaintiff suffered from depressive syndrome, characterized by anhedonia, or pervasive loss of interest in almost all activities, sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking.  (R. 234).  Dr. Leczycki found Plaintiff had one or two episodes of decompensation, based on her recent hospitalization, lasting for at least two weeks, and was mildly restricted in her activities of daily living and moderately restricted in maintaining social functioning and maintaining concentration, persistence or pace. (R. 235).  Also, Dr. Leczycki noted that even a minimal increase in mental demands or changes in environment may cause Plaintiff to decompensate and her symptoms would interfere with her ability to maintain reliable work attendance.  (R. 236).

Dr. Leczycki's Medical Assessment of Ability to do Work - Related Activities (Mental) indicated that Plaintiff had a fair ability ("ability to function in this area is seriously limited, but not precluded") to: follow work rules; relate to co-workers; deal with the public; use judgment; interact with supervisor; deal with work stresses; maintain attention or concentration; deal with changes in a routine work setting; understand, remember and carry out detailed, but not complex, job instructions; behave in a emotionally stable manner; and relate predictably in social situations  (R. 237-238).  Her concentration was affected by her emotional state.  Dr. Leczycki noted that Plaintiff was socially withdrawn, unstable and "very sensitive to outside stressors", but could manage her own benefits.

11

On July 15, 2002, Plaintiff saw James S. Bassett, Jr. M.D. for her lower back pain. (R. 253). Plaintiff stated her pain was constant, but intensity varied, and was worsened by walking, standing or bending over. Dr. Bassett found that Plaintiff suffered from degenerative disc disease, possible discogenic pain, and symptoms consistent with L4 nerve root irritation and facet generated pain. (R. 254). Dr. Bassett recommended starting with right L4-L5 transforaminal injections for the nerve root irritation and gave Plaintiff McKenzie exercises to be performed twice per day.

On July 18, 2002, Dr. Bassett performed a right L4-5 transforaminal injection on Plaintiff. (R. 251).

When Plaintiff saw Dr. Bassett on July 31, 2002, she stated that her "leg pain is 80% better" after receiving a right L4-L5 tranforaminal injection two weeks earlier, but she continued to have right-sided low back pain and lower lumbar facet join pain. (R. 248). Dr. Bassett found Plaintiff suffered from a right L4 nerve root irritation and scheduled her for L4-L5 and L5-S1 facet joint injections on her right side which she received on August 15, 2002. (R. 250).

### 3. VOCATIONAL EVIDENCE

Kriss Grandstaff testified as a Vocational Expert ("VE") at September 12, 2002, hearing. (R. 289). ALJ Blair asked Ms. Grandstaff to consider a hypothetical individual with the same age and educational background as the Plaintiff with the physical limitations of: only lifting 10 pounds occasionally, less than 10 frequently; occasional use of ramps or stairs, balancing, stooping, kneeling, crouching or crawling; no repetitive bending, twisting or turning at the waist; no reaching in all directions, including overhead with either upper extremity; and requiring a sit/stand option. (R. 291). ALJ Blair also asked Ms. Grandstaff to add the mental limitations of moderately limited in ability to understand, remember and carry out detailed instructions;

12

moderately limited in ability to maintain attention and concentration for extended period of time; mild to moderately limited in ability to interact appropriately with the general public, and accept instruction and criticism from supervisors, and moderately limited in ability to respond appropriately to changes in work setting.  (R. 291-292).  Ms. Grandstaff testified that, with these limitations, plaintiff could not perform any of her past work but could perform other work in the lower two-thirds of the lower peninsula of Michigan.  (R. 292-293).  These included 900 visual inspection jobs, 1,500 surveillance system monitor jobs, 1,700 referral and information clerk jobs, 7,500 booth cashier jobs, 800 identification clerk jobs, 1,000 appointment clerk jobs and approximately 7,200 teacher aide jobs in the region.  (R. 292).  When questioned by Plaintiff's representative, Diane Jonaitis, Ms. Grandstaff did specify that the teacher's aide position would need to be done with accommodations, due to the upper extremity limitations, which would cut the number of positions in half that did not have such accommodations.  (R. 293-294).  Also the booth cashier ticket seller would require accommodations and may require "some repetitive reaching and manipulation with the hands." (R. 295) Ms. Grandstaff stated if she were to take into account all Plaintiff's claims regarding her pain, discomfort and limitations, she would be precluded from doing her past work and there would not be a significant amount of jobs in the region she could perform.  (R. 293).

### 4. THE ALJ'S DECISION

ALJ Blair found that Plaintiff met the disability insured status requirements for a period of disability and DIB and is insured for benefits through the date of his decision.  Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  (R. 27).

ALJ Blair found that Plaintiff had a history of back problems beginning in 1978, bilateral shoulder pain, gatroesophageal reflux disease, degenerative disk disease, and depression.  (R.

13

29).  These impairments did not meet or equal one of the listed impairments in Appendix 1 to

Subpart P, Regulations No. 4.  ALJ Blair also found the Plaintiff's allegations regarding her

limitations to lack credibility.

Based on consideration of the record ALJ Blair found that Plaintiff had a residual

functional capacity to perform a limited range of sedentary work lifting no more than 10 pounds;

limited gripping and grasping with either upper extremity; no bending, twisting or turning at the

waist; no reaching in all directions, including overhead with either upper extremity; and the need

for a sit/stand option.  (R. 31).  He also noted for moderate limitations understanding detailed

instructions and in maintaining attention and concentration for extended periods.  (R. 33).

ALJ Blair also found that the Plaintiff falls in the "younger" category and has a high

school education.  She was found unable to perform any of her past relevant work and has no

transferable skills.  Using Medical-Vocational rule 201.27 as a framework for decision-making

ALJ Blair found that even with the Plaintiff's limitations, there are still "a significant number of

jobs in the national economy that she could perform," including those identified by VE

Grandstaff, but excluding the teacher's aide, identification clerk and appointment clerk jobs.[3]

(R. 34).  Therefore, Plaintiff was not disabled under the Social Security Act at any time through

the date of this decision.

## II.   ANALYSIS

### A. STANDARDS OF REVIEW

In adopting federal court review of Social Security administrative decisions, Congress

limited the scope of review to a determination of whether the Commissioner's decision is

---

[3] The ALJ also lists "17,000" instead of "1,700" information clerk jobs.(R. 32). Yet, the corrected total
number is 11,600 jobs in the region, which is still a substantial number.

14

supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry their burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than their past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[4]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

### B. FACTUAL ANALYSIS

Plaintiff challenges the Commissioner's decision[5] arguing it was not based on substantial

---

[4] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

[5] 20 C.F.R. §404.970 Cases the Appeals Council will review.

(a) The Appeals Council will review a case if—

(1) There appears to be an abuse of discretion by the administrative law judge;

(2) There is an error of law;

evidence because ALJ Blair failed to properly assess Plaintiff's mental limitations and did not provide a sufficient hypothetical question to the VE.  Thus the VE's testimony in response to a flawed and incomplete hypothetical question cannot provide substantial evidence that Plaintiff could perform the listed occupations.

In the alternative, it is argued that Grid Rule 201.14 directs a conclusion of disabled as of March 1, 2004, Plaintiff's 50th birthday.  While ALJ Blair's decision was March 27, 2003, the Appeals Council did not deny review until June 2005.  Plaintiff asserts the Appeals Council should have granted review of the ALJ decision and awarded benefits at least as of March 1, 2004.

### 1. *The Grid Rule 201.14 Argument*

Considering this second argument first, while this Court's granting such relief as of Plaintiff's 50th birthday may make sense, it is not within our authority.  First, the regulations on Appeals Council review is limited to errors in the ALJ' decision and certain broad policy or procedural issues of general interest.  Here Plaintiff was not 50 when she was before ALJ Blair nor before his decision was entered, thus he committed no error in not applying Grid Rule 201.14.  Furthermore, even if this Grid Rule 201.14 argument was made to the Appeals Council

---

(3) The action, findings or conclusions of the administrative law judge are not supported by substantial evidence; or

(4) There is a broad policy or procedural issue that may affect the general public interest.

(b) If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

*[45 FR 52081, Aug. 5, 1980, as amended at 52 FR 4004, Feb. 9, 1987]*

(which is not clear from the record), that body was within its scope of permitted discretion in deciding this was not a broad policy or procedural issue of general interest. Even where there is new evidence presented to the Appeals Council, the Appeals Council is to consider this evidence in determining whether to review the ALJ's decision only if the new and material evidence relates to time period on or before the date of the ALJ decision. 20 C.F.R. § 404.970(b). It seems hard to assert that the Appeals Council acted wrongfully if it applied the same time parameters to a new legal argument that was not applicable "to the period on or before the date of the administrative law judge hearing decision." Finally, even if it could be argued that the Appeals Council should have granted review to award benefits under Grid Rule 201.14, this Court's statutory jurisdiction under 42 U.S.C. § 405(g) is confined to review of the "final decision of the Secretary." If the Appeals Council had granted review, its decision might then have been the one that is final if it did not order a remand to the ALJ as is common upon such reviews. Yet, where the Appeals Council denies review, it is the ALJ's decision that is final and subject to federal court review, and not the Appeals Council's non-final administrative decision to deny review. *See Browning v. Sullivan,* 958 F.2d 817, 822-83 (8th Cir.1992) and *Damato v. Sullivan,* 945 F.2d 982, 988 (7th Cir.1991); 20 C.F.R. § 404.981. Thus this Court has no jurisdiction to review the Appeals Council decision.

### 2. *Plaintiff's Mental Impairments*

Plaintiff argues that ALJ Blair failed to properly consider her mental impairments as part of her disability. When evaluating Plaintiff's mental impairments, 20 C.F.R. § 404.1520a(e)(1) requires the ALJ to consider activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. The ALJ must take into account:

The basic mental demands of competitive, remunerative, unskilled work include

17

the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

SSR 85-16.

20 C.F.R. §§404.1520a(c)(1) requires consideration of "all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment".[6]  In addition, under §404.1520a(c)(2) the decision maker must consider the extent to which the mental impairment interferes with an "ability to function independently, appropriately, effectively, and on a sustained basis" including "such factors as the quality and level of [ ] overall functional performance, any episodic limitations [and] the amount of supervision or assistance [ ] require[d]."

Much of this analysis is done in a Psychiatric Review Technique Form (PRTF) like the one done here on  May 6, 2001 (R. 187).   Prior to October 2000, the PRTF was completed at the state agency level and a form was completed by the ALJ and attached to the decision.

 SSA revised its regulation in September 2000 and modified 20 C.F.R. §404.1520a(e)(2) to no longer require the ALJ to complete and attach a PRTF.  Instead, the ALJ in the decision:

> must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The

---

[6]  20 C.F.R. §404.1545(c) requires consideration of "residual functional capacity for work activity on a regular and continuing basis" and a "limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting."

18

decision must include a specific finding as to the degree of limitation in each of
the functional areas described in paragraph (c) of this section.

20 C.F.R. §404.1520a(e)(2)

Again the paragraph (c) referred to lists the functional areas of daily living; social

functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R.

§404.1520a(c).  Here, ALJ Blair did consider and made findings on areas of moderate limitations

in understanding, maintaining attention and concentration (R. 33), and he properly incorporated

these – as well as some factors on social functioning with the public and dealing with supervisors

– in his hypothetical question to the VE (R. 292).  Yet, ALJ Blair analysis of the mental

evidence is a single paragraph (R. 30) that cannot be said to "show the significant history,

including examination . . . findings, and the functional limitations that were considered in

reaching a conclusion about the severity of the mental impairment . . . [and which] include[s] a

specific finding as to the degree of limitation in each of the functional areas" of  daily living;

social functioning; concentration, persistence, or pace; and episodes of decompensation.  Had he

adopted the PRTF in the record (R. 177-190), or attached it, as was the former practice, that

might have been sufficient.

As noted in *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 545 (6th Cir.

2004):

> It is an elemental principle of administrative law that agencies are bound to follow their
> own regulations. As the Ninth Circuit well summarized in applying this principle:
>
>> 'The Supreme Court has long recognized that a federal agency is obliged
>> to abide by the regulations it promulgates." *See Vitarelli v. Seaton,* 359
>> U.S. 535, 545, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Service v. Dulles,* 354
>> U.S. 363, 372, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Accardi v.
>> Shaughnessy,* 347 U.S. 260, 267, 74 S.Ct. 499, 98 L.Ed. 681 (1954).
>
> This is particularly true where the regulations, as here, were promulgated to provide

parties with procedural safeguards.  Thus, the question here is whether this technical failing to

fully comply with 20 C.F.R. §404.1520a(e)(2) should be considered "harmless error."  There are,

after all, many reasons to discount Plaintiff's claims that it is now her mental limitation that is

disabling – and not her physical impairments that have improved with surgery and were

adequately accommodated by the ALJ in the hypothetical question to the VE.  When she applied

for disability, it was because of her shoulder, neck and back problems with no mention of

psychological limitations (R. 52), although her counselor, Dr. Geer, was listed (R. 54) as was the

use of Prozak (R. 57).  At her first hearing, her then representative noted the major depression –

which he also characterized as "mild" –  did "not significantly" impact her ability to perform

work related activities, and "[t]he main problem is chronic pain."  (R. 259).  Even at her second

hearing on her second DIB application, when asked what problems Plaintiff currently had that

prevented her from working on a full time basis, Plaintiff discussed her multiple shoulder

surgeries and made no mention of any mental impairments.  (R. 279).  When examined by her

representative, after discussing her pain problems and need for a recliner, she finally mentioned

medication for depression and her February 2002, hospitalization for stress.  Plaintiff

acknowledged "[a]lways being a depressed person" noting that the loss of her job and of her

brother made it worse (R. 289).  Yet, other than the single episode of decompensation requiring

hospitalization, there was no information provided at the hearing on her depression's effects on

daily living, her social functioning or even her concentration, persistence or pace.  ALJ Blair

noted that Plaintiff's 20 plus years at General Motors ended "because of her shoulders not due to

mental problems." (R. 30).

        Under 20 C.F.R. § 404.1502 Dr. Geer, who had treated Plaintiff since July 28, 2000, for

major depression, qualifies as a treating physician.  Generally, treating physician's opinion

should be given greater weight.[7]  While ALJ Blair did accept some of Dr. Geer's findings, he

failed to evaluate the reports as a whole.  ALJ Blair's report on Dr. Geer's findings in her March

17, 2001, report was accurate to a point – that Plaintiff suffered from major depression including

sleep disorder, lack of motivation, lowered libido, increased appetite with waking feelings of

irritability, being easily overwhelmed and helpless, agitation, cognitive impairment and panic.

(R. 29, 167).  Yet, ALJ Blair then discounts these findings by stating that Dr. Geer reported that

Plaintiff's "depression stabilized with prescribed antidepressant medication and that she was

very active and very committed to remaining sober."  (R. 29).  This optimistic characterization

misreads what Dr. Geer actually stated, which was that Plaintiff "is *ordinarily* a very active

social person, very committed to remaining sober, involved with her family and friends who had

experienced great difficulty adjusting to her physical lifestyle changes … but continues to be

plagued by financial concerns, isolation due to physical discomfort and very little optimism

about the future." (R. 167).

    ALJ Blair also interpreted Dr. Geer's report as stating: "Prognosis is good. Dr. Geer

concluded her report by stating that the claimant would function best with some kind of

meaningful activity and that cognitively she was functioning very well." (R. 29). Dr. Geer's

report stated:

> The prognosis for her is very good *if she can get resolution of her health*
> *conditions including shoulder pain, energy, and depression, smoking as well as*
> *determination of her SSI (sic) status.* I cannot speak to her physical ability to

---

[7]  *Wilson v. Commissioner. supra,*  378 F.3d at 544:

> Pursuant to this regulation, an ALJ must give more weight to opinions from treating sources
> since these sources are likely to be the medical professionals most able to provide a
> detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a
> unique perspective to the medical evidence that cannot be obtained from the objective
> medical findings alone or from reports of individual examinations, such as consultative
> examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).

21

work, but can say that inactivity is extremely difficult for this client and that she would function best with some kind of meaningful activity. In fact she will need to be restricted from over exerting herself physically and emotionally.

(R. 168) (*emphasis added*).

ALJ Blair's assessment of Plaintiff's visit to the emergency room on February 19, 2002, fails to mention that she had suicidal thoughts, which concerns of self harm prompted Dr. Cordoba - Naguit to send Plaintiff to the emergency room. (R. 29, R. 220). Nor does he mention that she was hospitalized for 3 days. (R. 29, R. 217-226). When Plaintiff arrived at the emergency room, she informed the physician that she was afraid she would "lose control" and "had lots of drugs" and would take them. (R. 219). ALJ Blair stated:

> On February 19, 2002, the claimant was seen at a hospital emergency department after being extremely distraught over a breakup of a relationship. Diagnosis was major depression.

(R. 29).

ALJ Blair agreed that Plaintiff's ability to tolerate stress was limited, "but only to the extent that unusually stressful situations should be avoided … In this case the claimant must avoid unusually high levels of stress, but there is no evidence which indicates that she cannot tolerate the lower levels of stress usually encountered routine, unskilled of jobs." (R. 30). This statement is not supported by Dr. Adam Leczycki, who evaluated Plaintiff in relation to her 2002 hospitalization and stated in his Affective Disorders Questionnaire, "even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." (R. 236). Dr. Leczycki further believed that Plaintiff's depressive syndrome would "interfere with her ability to maintain reliable work attendance in a work setting." This issue involving persistence in getting to work was not considered in the hypothetical question, nor were

22

reasons given by ALJ Blair for rejecting this opinion of a treating psychiatrist.

In light of the abbreviate, incomplete and occasionally inaccurate treatment of Plaintiff's mental problems – which do seem to have worsen after she quit work – it cannot be said that ALJ Blair's failure to comply with §404.1520a(e)(2) and make the required specific finding under §404.1520a(c) on the degree of limitation in each of its four functional areas should not be considered harmless error.

*Allen v. Barnhart,* 357 F.3d 1140, 1145 (10th Cir. 2004), urged caution in analyzing whether an error should be considered harmless:

> [W]e have specifically applied [the principle of harmless error] in social security disability cases, though not always by name and without settling on a definitive characterization of its precise contours and range of application in this somewhat unique, nonadversarial setting. For example, this court has held that certain technical errors were "minor enough not to undermine confidence in the determination of th[e] case," *Gay v. Sullivan,* 986 F.2d 1336, 1341 n. 3 (10th Cir.1993); *Diaz v. Secretary of Health & Human Servs.,* 898 F.2d 774, 777 (10th Cir.1990), and that an "ALJ's conduct, although improper, d[id] not require reversal" because the procedural impropriety involved had not "altered the evidence before the ALJ," *Glass v. Shalala,* 43 F.3d 1392, 1396-97 (10th Cir.1994). For present purposes, one significant thing this heterogeneous group of cases has in common is that in none of them did this court hold an ALJ's failure to make a dispositive finding of fact harmless on the basis that the missing fact was clearly established in the record, which is the only possible basis for invoking the principle in this case.
>
> Two considerations counsel a cautious, if not skeptical, reception to this idea. First, if too liberally embraced, it could obscure the important institutional boundary . . . that courts avoid usurping the administrative tribunal's responsibility to find the facts. Second, to the extent a harmless-error determination rests on legal or evidentiary matters not considered by the ALJ, it risks violating the general rule against post hoc justification of administrative action recognized in *SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943) and its progeny.
>
> With these caveats, it nevertheless may be appropriate to supply a missing dispositive finding under the rubric of harmless error in the right exceptional circumstance, i.e., where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could

have resolved the factual matter in any other way.

*See* also *Neal ex rel. Walker v. Barnhart* , 405 F.3d 685, 689 (8th Cir. 2005) ("Harmless

error analysis may be appropriate to supply a missing dispositive finding in a social

security disability proceeding, where, based on material the ALJ considered, the court

can confidently say that no reasonable administrative fact finder, following the correct

analysis, could have resolved the factual matter in any other way.")

It is significant that the Sixth Circuit in *Wilson* remanded to the Commissioner a

denial of Social Security benefits because an ALJ's failure to give "good reasons" for

rejecting the treating source's opinion, as is required by 20 C.F.R. §404.1527(d)(2),

noting this was appropriate even if substantial evidence otherwise supports the ALJ's

decision.  *Wilson*, *supra,* 378 F.3d at 547.  A court is not to rewrite the administrative

decision *post hoc* even where it can find substantial evidence in the record to uphold the

decision based on a better crafted analysis and set of findings that it might devise.

Harmless error is to be applied only to a limited group of cases where no reasonable

administrative fact finder, following the correct analysis, could have resolved the factual

matter in any other way, not where the court anticipates the final outcome will be

unchanged after the remand.

## III.   RECOMMENDATION:

Accordingly, for the above stated reasons, IT IS RECOMMENDED that this matter be

REVERSED AND REMANDED for further administrative proceedings consistent with this

Report.[8]

---

[8] Obviously on remand the ALJ will consider whether Grid Rule 201.14 directs a conclusion of disabled
as of March 1, 2004, Plaintiff's 50th birthday.  Indeed, in light of the significant reasons noted in this
Report that the mental limitations may not ultimately demonstrate disability prior to Plaintiff's 50th

The parties to this action may object to and seek review of this report and recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C.. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985);  *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this report and recommendation. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: June 30, 2006                              s/Steven D. Pepe
Ann Arbor, Michigan                               UNITED STATES MAGISTRATE JUDGE

---

birthday, the parties might arrive at an expedited consensual resolution to a determination of disability as of March 1, 2004, which was the alternative relief Plaintiff sought in this Court, which we do not have authority to grant.

25

<u>Certificate of Service</u>

I hereby certify that a copy of this Report and Recommendation was served upon the attorneys of record by electronic means on June 30, 2006.

s/William J. Barkholz
Courtroom Deputy Clerk
